UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVID ROGOZ,                                    :
    Plaintiff,                              :
                                            :          CIVIL ACTION NO.
    v.                                      :          3:11-cv-00500 (VLB)
                                            :
CITY OF HARTFORD,                               :
CHIEF OF POLICE DARYL K. ROBERTS,               :
DETECTIVE G. WATSON, DETECTIVE                  :
RIVERA, OFFICER GEORGE WATER,                   :
OFFICER JAMES RUTKAUSKI, OFFICER                :
BRANDON FLORES, OFFICER STEVEN J.               :
PILESKI, OFFICER CESAR A. BEIROS,               :
    Defendants.                             :          July 22, 2013

<u>MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT [Dkt. #s 52, 54]</u>

I.    <u>Introduction</u>

       The Plaintiff, David Rogoz ("Rogoz"), brings this action against Defendants

City of Hartford (the "City"), Chief of Police Daryl Roberts ("Chief Roberts"),

Detectives Watson and Rivera, and Officers Water, Rutkauski, Flores, Pileski, and

Beiros (the Detectives and Officers, collectively, the "Defendant Officers").  After

both the Court's September 24, 2012 decision granting the City's and Chief

Roberts' Motion to Dismiss in part, and the Plaintiff's withdrawal of certain

claims[1] in his oppositions to the Defendants' summary judgment motions, four

---

[1] In his Oppositions to Defendants' Motions for Summary Judgment, the Plaintiff
has conceded that summary judgment is proper as a matter of law as to several
of his claims.  Specifically, Plaintiff concedes that summary judgment is proper
as to his claims for false arrest and imprisonment in violation of the Fourth
Amendment, as Plaintiff did not enjoy a favorable termination of the charge for

counts remain in this action.  **Count One alleges claims against the Defendant Officers in their individual capacities for violations of Rogoz's Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, as well as his rights under Article First, section 7 of the Connecticut Constitution (protecting against unreasonable uses of force), on the basis that the Defendant Officer or Officers employed excessive force against him at the time of his arrest and/or failed to protect or intervene.  Count Two alleges state common law negligence, assault and battery, and negligent and/or intentional infliction of emotional distress as against the Defendant Officers in their individual capacities.  Count Three alleges Fourth and Fourteenth Amendment and Connecticut constitutional violations against Chief Roberts in his individual capacity both for the Chief's alleged failure to investigate Rogoz's civilian complaint to the Police Department, and for his alleged failure to screen, train, or supervise the Defendant Officers.  Finally, Plaintiff alleges in Count Four that the City is liable for the negligent acts of the**

---

**which he was arrested.  Plaintiff also concedes that summary judgment is proper as to Plaintiff's allegations that the Defendants denied his requests for medical attention, as Plaintiff has specifically testified that he did not request medical care until he was in the custody of the State of Connecticut Department of Corrections, and out of the control of the Hartford Police Department, whose officers and Chief make up the defendants in this action.  Thus, summary judgment is GRANTED in favor of Defendants as to Plaintiff's allegations of false arrest, false imprisonment, and failure to provide medical treatment in violation of the Fourth Amendment in Count 1, and also under Article First, section 9 of the Connecticut Constitution, which protects against false arrest.  Summary judgment is also GRANTED in favor of Defendants as to Plaintiff's Count 4 as relates to his allegations of false arrest, false imprisonment, and failure to provide medical treatment.  *See* Plaintiff's Opposition to City of Hartford's and Chief of Police Roberts' Motion for Summary Judgment, Dkt. 57 at pp. 4, 8; Plaintiff's Opposition to the Defendant Officers' Motion for Summary Judgment, Dkt. 58 at pp. 7-8.  *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (affirming that under Connecticut law, favorable termination is an element of a section 1983 claim sounding in false imprisonment or false arrest).**

Defendant Officers pursuant to Conn. Gen. Stats. § 52-557n and § 7-465, in connection with the Officers' alleged negligent use of excessive force and their alleged negligent failure to protect or intervene.  Currently pending before the Court are Defendant City of Hartford's and Chief Roberts' Motion for Summary Judgment [dkt. 52], and the Defendant Officers' Motion for Summary Judgment [dkt. 54].  For the reasons that follow, Defendants' Motions are GRANTED as to Plaintiff's federal law claims and certain state law claims.  The Court declines to exercise supplemental jurisdiction over the balance of Plaintiff's state law claims.

## II.   <u>Local Rule 56 Statements</u>

As an initial matter, the Court notes that Plaintiff has failed to comply with Rule 56(a) of the Local Rules of Civil Procedure for the District of Connecticut. Local Rule 56 requires that a party filing a summary judgment motion annex a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)1.  Local Rule 56(a)2 requires that a party opposing a motion for summary judgment must then file an answering document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)2.  Each statement of material fact in a Local Rule 56(a)1 or Local Rule 56(a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R.

56(a)3.  Further, "[a]ll material facts set forth in [a moving party's 56(a)1 statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party."  D. Conn. L. Civ. R. 56(a)1.  Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F.Supp.2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).

Here, Defendants have submitted a Local Rule 56(a)1 statement with specific citations to evidence in the record.  Plaintiff, however, has failed to properly deny many of the specific facts the Defendants have proffered, either by failing to support his denials with citations to evidence in the record contradicting the Defendants' alleged facts, or by simply stating that he "is without sufficient information to admit or deny" certain statements.  Thus, where Plaintiff has objected to Defendants' facts but has failed to support his objection with any admissible evidence in the record, where the record itself does not support Plaintiff's denials, or where the Plaintiff has neither admitted nor denied a fact, those facts are deemed to be admitted.  *See Buell v. Hughes*, 568 F. Supp. 2d 235, 237 (D. Conn. 2008) on reconsideration, 596 F. Supp. 2d 380 (D. Conn. 2009) (plaintiffs' response that they "lack[ed] sufficient information to agree or disagree" with defendant's facts was an improper denial under Rule 56(a)2, as it neither agreed with nor denied the defendant's statements); *Henton v. City of*

4

*New London*, CIV.3:06 CV 2035 (EBB), 2008 WL 2185933 (D. Conn. May 23, 2008) (same); *Knight*, 2006 WL 1438649 (deeming admitted defendant's undisputed facts where plaintiff responded that he "ha[d] no knowledge" of or "disagree[d] with" the statements and where he offered no evidence in dispute);  *Walton v. State of Conn., Dep't of Soc. Servs.*, 3:03CV2262 JBA, 2006 WL 533793 (D. Conn. Mar. 2, 2006) (deeming admitted defendant's material facts where plaintiff claimed insufficient knowledge to respond and offered no evidence to dispute facts); *Reynolds v. Town of Suffield*, 3:10CV1528 JBA, 2012 WL 3135896, at *1 n.1 (D. Conn. July 31, 2012) (deeming admitted facts that were supported by the evidence where non-moving party failed to cite to admissible evidence to support denials).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (holding that Federal Rule of Civil Procedure 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

### III.    Factual Background

The following facts relevant to the Defendant's Motion for Summary Judgment are undisputed or admitted unless otherwise noted.

On Friday May 8, 2009, David Rogoz drove to Lawrence Street in Hartford, Connecticut, pulled his 1999 Chevy Blazer to the side of the street, and paid an unidentified individual $50.00 in exchange for "a bundle" – or several baggies – of heroin.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶5; Dkt. 52-13, P's Depo. pp. 62-63, 67].

Rogoz then proceeded to make a right turn onto a one way street and pulled his car over once again.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶6].  As he pulled his car to the curb, Rogoz noticed a small red Honda pull up "right behind" him.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶7; Dkt. 52-13, P's Depo. p.64].  Rogoz found this to be suspicious, so for a third time Rogoz "pulled back out, went down the street, [and] pulled over again."  [Dkt. 52-13, P's Depo. p.65].  The red Honda then "pulled up in front of [Rogoz]" approximately twenty feet from his front bumper and "someone started to get out."  [*Id*. at pp.65, 66].

Alarmed, Rogoz backed his car up "a little bit" on the one way street and, as he was looking backward, noticed an oncoming car driving toward him, so he turned his head to the front and began to drive forward.   [Dkt. 52-13, P's Depo. pp.68-69; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶9].  At that point the individual from the red Honda began running toward Rogoz's car.  [Dkt. 52-13, P's Depo. pp.68-69].  Rogoz, who did not recognize the car or the individual who emerged from the driver's door, then "took off" because he was scared.  [*Id*. at pp.65, 68, 69].  Rogoz drove up over the curb on his left, drove on the sidewalk around the man's car at approximately twenty miles per hour, and re-entered the roadway.   [Dkt. 52-13, P's Depo. pp.68, 69, 113; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶10].  The man who had exited the red Honda was in the roadway at the time.  [Dkt. 52-13, P's Depo. p.69].  Rogoz testified that he could provide no identifying details as to this individual at the time the individual was running toward Rogoz's car, because "it was just so fast, and right then I'm just trying to get, you know . . . around him, but then it was obvious.  I could tell even with the door opening; and the way I

saw him the first time, it seemed like something, you know, something wasn't right." [*Id.* at p.68]. Rogoz also testified that at that point he was unsure if the individual was alone, but that he had only noticed one person exiting the red Honda. [*Id.* at p.70].

Rogoz then turned onto various city streets, accelerating and driving through the city at approximately fifty miles per hour before entering onto Interstate 84. [*Id.* at p.72-73]. At his deposition, Rogoz testified: "I was going fast up until I hit the highway. Then I was driving like appropriate for the highway because I didn't see anyone, and I didn't think anyone was behind me or anything, so once I hit the highway, I was at appropriate highway speed." [*Id.* at p.73]. He further testified that "I knew when I was scared I drove unreasonably fast to get to the highway; I did." [*Id.* at p.76]. As he was driving through the city, Rogoz "possibly" ran a red light without stopping. [*Id.* at p.114]. Rogoz testified that by the time he reached the last two Hartford city streets before the highway, he did not believe anyone was following him. [*Id.* at p.72-73].

According to his Police Department Incident Report, Detective G. Watson was conducting surveillance for illegal drug activity on the morning of May 8, 2009 in the Lawrence Street area, a "hot spot area for illegal drug activity" about which Watson noted that the Police Department had received "numerous complaints from the local Citizens" and in which he had made "numerous arrests." [Dkt. 52-8, Exh. A-5 p.36, Watson Report p.1 (Bates 036)]. Watson observed a blue Chevy Blazer travel south on Lawrence and park at the street curb. [*Id.*]. Watson reported that he then observed an unidentified male

approach the vehicle's passenger window, engage in a brief conversation with the vehicle's operator, reach into the vehicle, and hand the driver a small item in exchange for money, actions he described as "consistent with a street level drug deal." [Dkt. 52-8, Exh. A-5 p.36-37, Watson Report pp.1-2 (Bates 036-037)]. Watson then followed directly behind the Blazer as it pulled away from the curb and drove south on Lawrence, and then parked in front of the Blazer on Babcock Street, a one-way street on which the Blazer had pulled over. [Dkt. 52-8, Exh. A-5 p.37, Watson Report p.2]. Watson recounted in his Report that he "approached the passenger side of [the] vehicle" with his badge displayed and verbally identified himself as Hartford Police, at which point "Rogoz placed his vehicle into reverse and quickly backed down the wrong way on [the one way street] almost causing on coming vehicles to crash into him." [*Id.*]. The Blazer "then drove forward directly at" Watson. [*Id.*]. Watson recounts that the Blazer then drove onto the sidewalk "at a high rate of speed," going around Watson and parked vehicles, ran the red light at the end of the street and turned west onto Capitol Avenue at a high rate of speed. [*Id.*]. Watson reported that he followed Rogoz's Blazer without Rogoz seeing him "from a distance onto Rt. 84 east while broadcasting our direction over the police radio." [*Id.*]. Hartford Police Department dispatch records show that at 10:23 a.m. on May 8, 2009, dispatch received a call concerning a blue Blazer, and that Watson was "en route" at that time. [Dkt. 52-4, Exh. A-1, Dispatch Records p.1; see also Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶3].

As Rogoz was driving on Interstate 84 East and approaching the connector with Route 2 East in East Hartford, he testified that he noticed two Hartford police cruisers with their lights activated driving up behind him, so he pulled over.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶15; Dkt. 52-13, P's Depo. p.73-74].  Rogoz further testified that he did not find it strange that Hartford police would pull him over on an interstate highway in another town because "I took off out of there so fast, and I didn't know if I was seen at that point.  I mean, I traveled very fast when I was scared, you know."  [Dkt. 52-13, P's Depo. p.77].  Rogoz believes there were "a couple other" police cruisers at the scene in addition to the two he saw as he was driving.  [*Id.* at p.75].

After he had pulled over, Rogoz recalled that one police cruiser pulled to the side of the highway in front of his vehicle and a second cruiser pulled behind.  [*Id.* at p.78].  The officer from the cruiser in front of Rogoz's vehicle exited his cruiser and approached Rogoz's Blazer from the front with his gun drawn.  The officer directed Rogoz to put his hands up, exit his vehicle, and lie face down on the ground with his hands behind his back.  [Dkt. 52-13, P's Depo. pp.78-79; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶¶16, 17].  Rogoz complied.  [*Id.*].

At that point, as he was lying face-down, Rogoz testified that "that was when . . . it was like someone came up on me, and it was boom.  Someone like threw all their weight on me.  I could feel like their knees in my back smashed me, smashed my face into the pavement."  [Dkt. 52-13, P's Depo. p.79].  Rogoz explained that it seemed like the officer "ran up and jumped with his weight onto" Rogoz's mid to lower back on the right side, one time.  [*Id.* at pp.81, 85].  When

**9**

asked if the officer had used one knee or two knees in effectuating this force, Rogoz testified: "I'm not sure specifically.  It felt like someone just jumped on me . . ."  [*Id.* at p.80].  As the officer was placing his weight on Rogoz's back, Rogoz recalls the officer saying in his ear "you'll never take off from the police again" and asking why Rogoz had "run."  [*Id.* at pp.84, 86].

Rogoz testified that the officer who placed his weight on Rogoz's back then handcuffed him.  [Dkt. 52-13, P's Depo. p.84].  Rogoz believes that the officer who placed his weight on him, handcuffed him, and asked him why he ran was a plain-clothes police officer.  [*Id.* at pp.84-85].  Of the officers at the scene, Rogoz recalls that one was dressed in plain clothes, while the rest were uniformed.  [*Id.* at p.80].  Detective Watson, who was dressed in plain clothes, filed an Incident Report in which he recalled that "Rogoz was taken out at gunpoint and laid onto the ground at which time I approached and handcuffed him."  [Dkt. 52-8, Exh. A-5 p.37, Watson Report p.2].  Moreover, Rogoz acknowledged his belief that Detective Watson had handcuffed him as Watson had reported handcuffing Rogoz in his Incident Report: "when [Watson] said he's the one that handcuffed me, he was the one who handcuffed me after doing that to me."  [Dkt. 52-13, P's Depo. p.84].  Rogoz further attested that the officer who handcuffed him was the same officer who had applied the force against him: "that person who did that [allegedly applied excessive force] to me handcuffed me."  [*Id.* at p.84].  Rogoz alleges that he suffered a laceration to the bridge of his nose, as well as back and rib injuries, as a result of the officer's use of force against him.  [*Id.* at pp.82-83].

The officers then pulled Rogoz to his feet, and the plain clothes officer asked Rogoz where the drugs were and from whom he had obtained them.  [Dkt. 52-13, P's Depo. pp.84-86].  In response, Rogoz divulged to the officers the location of the drugs he had purchased.  [*Id.* at p.86].  According to Rogoz, four to six Hartford Police officers were present and outside their vehicles during his arrest.  [*Id.* at p.79].  Aside from the officer who applied the force, Rogoz testified that he believed "there was just one other [officer] like close in as they were doing this to me" but that he believed "other ones" were "right around."  [*Id.* at pp.80-81].  According to the Hartford Police Department dispatch records, officers Watson, Rutkauski, Flores, Pileski, and Beiros responded to the scene.  [Dkt. 52-4, Exh. A-1, Dispatch Records pp.1-3].

After his arrest, Rogoz was placed in a police cruiser and transported by a uniformed officer to the Hartford Police Department's police station at 50 Jennings Road, Hartford, where he arrived at 11:03 a.m. and was placed in a holding cell until around 7:00 p.m.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶23; Dkt. 52-4, Exh. A-1, Dispatch Records p.5; Dkt. 52-13, P's Depo. pp.89-90].  During transport to and while Rogoz was at the station he did not ask for medical assistance.  [Dkt. 52-13, P's Depo. p.91].  At around 7:00 p.m. on May 8 Rogoz was transported from the Hartford police station at Jennings Road to the state of Connecticut Department of Corrections, GA#10, at 101 Lafayette Street in Hartford, where he was held until May 10, 2009.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶26].  Although Rogoz asserts that he had not used any drugs or alcohol or taken any medications the

morning of May 8, he admits that he used heroin on the afternoon of May 7, the day before this incident.  [Dkt. 52-13, P's Depo. pp.87-88].

Rogoz asserts that, in addition to receiving a laceration to the bridge of his nose, from the time that the plain clothes officer put his weight on Rogoz's back, he was in "horrible pain;" however, he first requested medical treatment of the State Marshals at the Department of Corrections, GA#10, around 6 or 7 p.m. on Saturday, May 9, only after he had left the custody of the Hartford Police.  [Dkt. 52-13, P's Depo. pp.93-94].  The following day, at 4:15 p.m., the Hartford Dispatch received a call from a State Marshal requesting transport for "prisoner [Rogoz] for meds," and at 4:18 p.m. the Hartford Police dispatched an officer to transport Rogoz to Hartford Hospital.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶¶28, 29; Dkt. 52-5, Exh. A-2, Dispatch Summary p.1].  Once there, Rogoz complained of pain in his ribs and back and difficulty breathing.  [Dkt. 52-13, P's Depo. p.97; Dkt. 57-5, Htfd. Hosp. Med. Recs. pp.12, 14, 18].  A chest x-ray revealed "a fracture of the posterior aspect of the right 11th rib though appearance suggests this may be related to an old injury."  [Dkt. 57-5, Htfd. Hosp. Med. Recs. p.22].  Rogoz was given advice pertaining to "contusions, bruises, sprains, [and] strains" and was advised to rest, apply cold and hot packs to the affected area, and to seek further medical care if symptoms persisted.  [*Id.* at p.23; *see also* dkt. 52-13, P's Depo. p.98].

On May 15, 2009, four days after he had appeared in state court and had been released from prison, Rogoz visited Midstate Medical Center complaining of continued pain in his ribs and back.  [Dkt. 52-13, P's Depo. p.100].  A chest x-ray

revealed clear lungs and "no acute pathology." [Dkt. 57-5, MidState Med. Recs. p.4; Dkt. 52-13, P's Depo. p.101]. An x-ray of Rogoz's unilateral right ribs showed a "displaced fracture of the right posterolateral 11th rib." [Dkt. 57-5, MidState Med. Recs. p.5]. A subsequent x-ray on June 29, 2009 of Rogoz's lumbosacral spine revealed "[s]ubacute appearing fractures involving the right L1 and L2 transverse processes," as well as "[d]egenerative disc narrowing and facet joint degenerative change bilaterally at L5-S1," but "[n]o evidence for vertebral body fracture." [*Id.* at p.6].

An MRI of Rogoz's lumbar spine on September 23, 2009, more than four months after the incident, showed "[n]o evidence for fracture," a "[d]isc bulge with annular tear and foraminal stenosis at L4-L5, right greater than left," and "[d]isc degeneration and disc bulge with foraminal stenosis at L5-S1, right greater than left." [Dkt. 57-5, CT Valley Radio. Recs. p.25].

As a result of this incident and his arrest Rogoz was charged with Possession of Narcotics in violation of Conn. Gen. Stat. §21a-279(a), Disobeying an Officer's Signal to stop in order to escape or elude in violation of Conn. Gen. Stat. §14-223, and Reckless Driving in violation of Conn. Gen. Stat. §14-222. [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶24; Dkt. 52-8, Exh. A-5 p.36, Watson Report p.1]. He pled guilty to felony possession of narcotics in violation of Conn. Gen. Stat. §21-279(a) on October 29, 2009, and for which he paid a $300 fine. [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶¶31; Dkt. 52-14, Rogoz Plea Transcript 10/9/09, pp.1, 3]. The court entered a nolle as to Rogoz's other charges. [Dkt. 52-14, Rogoz Plea Transcript 10/9/09, p.1].

a.  **Rogoz's Civilian Complaint**

As of May 2009 the Hartford Police Department had in effect a civilian complaint procedure which permitted citizens to file complaints against officers. These complaints were investigated by the Department's Internal Affairs Division, with an avenue of appeal to the City's Civilian Police Review Board.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶37; Dkt. 52-3, Exh. A, Wiebusch Aff. ¶12].  In September 2009 Rogoz availed himself of this procedure and filed a civilian complaint alleging excessive force against Detective Watson and Detective Pedro Rivera and to which the Internal Affairs Division assigned an investigator, Sergeant Michael Manson.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶¶38, 39; Dkt. 52-9, Exh. A-6, Rogoz Complaint; Dkt. 52-8, Exh. A-5 p.6, Rogoz Complaint Investigative File p.1 (Bates 006)].  The City's Office of Human Relations sent Rogoz a letter on September 17, 2009 confirming that the Internal Affairs Division had received and would be investigating Rogoz's complaint.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶40; Dkt. 52-10, Exh. A-7, 9/17/09 Letter to Rogoz].  After filing his complaint, Rogoz recalled receiving communications from the City in connection with their investigation into his complaint; specifically, communications "saying the basic things they were doing checking out the complaint."  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶42; Dkt. 52-13, P's Depo. p.115].

Rogoz recalled speaking with someone in Internal Affairs to arrange an appointment to be interviewed regarding his complaint.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶44; Dkt. 52-13, P's Depo. pp.116, 117].  He believes, however, that he cancelled the appointment.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶44; Dkt. 52-13, P's

Depo. pp.116, 117].  On November 10, 2009, Sergeant Manson sent a letter to Mr. Rogoz noting Rogoz's cancellation of an interview scheduled for November 10, 2009, requesting that Rogoz reschedule the interview, and indicating that this interview was imperative to Manson's investigation of the incident.  [Dkt. 52-8, Exh. A-5 p.23, 11/10/09 Letter to Rogoz, Bates p.023; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶43].  Mr. Rogoz testified that he received this letter.  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶43; Dkt. 52-13, P's Depo. p.116].  Rogoz, though, never met with a City representative in connection with the investigation of his civilian complaint.  [Dkt. 52-13, P's Depo. p.117; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶44].

On December 14, 2009, Sergeant Manson prepared an investigative report in which he detailed the evidence he reviewed, including Rogoz's complaint, the Department's dispatch records and audio files, Watson's Incident Report, and various arrest forms, and the interviews he conducted, including interviews of Detectives Watson, Rivera, Pileski, Rutkauski, Flores, and Sergeant Michael Cacioli.  [Dkt. 52-8, Exh. A-5 pp.3-13, Manson Inv. Report (Bates 003-013)].  Based on his investigation, Sergeant Manson concluded that Rogoz's allegations of excessive force against both officers were not sustained.  [Dkt. 52-8, Exh. A-5 p.13, Manson Inv. Report (Bates 013)].

On March 11, 2011 Chief of Police Daryl Roberts sent Rogoz a letter informing him that, after a "thorough investigation," Rogoz's allegation of excessive force against Detectives Watson and Rivera was not sustained, as "[t]he investigation failed to discover sufficient evidence to clearly prove or disprove the allegation."  [Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶46; Dkt. 52-11, Exh. A-8,

3/11/11 Letter to Rogoz].  The letter also advised Rogoz of his right to appeal this determination to the City's Civilian Police Review Board.  [*Id*.].  Rogoz believes that he received this letter.  [Dkt. 52-13, P's Depo. pp. 117-18; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶46].  Rogoz does not know if he appealed the disposition of his complaint to the Civilian Police Review Board.  [Dkt. 52-13, P's Depo. p.118; Dkt. 52-2, Ds' 56(a)1 Stmnt. ¶44].

### IV.   Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere

assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

## V.   <u>Discussion</u>

### a.  <u>Excessive Force in violation of the Fourth Amendment as against the Defendant Officers (Count 1)</u>

Rogoz alleges that the force used against him after he had complied with orders to exit his vehicle, lie face down on the ground, and put his hands in the air was excessive and thus in violation of the Fourth Amendment.  The Defendant Officers seek summary judgment on two grounds: first, that the alleged use of excessive force was not objectively unreasonable based on the totality of the circumstances because Rogoz posed an immediate threat to the safety of the officers on the scene or to others, the crimes with which Rogoz was charged were serious, and Rogoz attempted to evade arrest by flight; and second that,

even if the force allegedly employed violated Rogoz's Fourth Amendment rights, qualified immunity shields the officer who used the force from liability.

> ### i.   <u>Excessive Force as against Defendants Rivera, Water, Rutkauski, Flores, Pileski, and Beiros</u>

Before addressing the merits of Defendants' Motions for Summary Judgment as to Plaintiff's excessive force claim, the Court must necessarily address the issue of the identity of the officer allegedly responsible for using excessive force against Mr. Rogoz.  The Defendants contend both that (1) Mr. Rogoz is unable to identify which officer applied the force against him, and his lack of specific evidence against any one officer is fatal to Plaintiff's excessive force claim against all of the officers; and (2) that Plaintiff "cannot identify that it was any one of the other officers aside from Detective Watson that used the alleged excessive force against him," making summary judgment in favor of all Defendants other than Watson proper as to Plaintiff's excessive force claim.  [Dkt. 52-1, Ds' MSJ pp. 4, 11].  The Plaintiff counters that his inability to name the officer or officers allegedly directly responsible for the use of force, combined with each of the Defendant Officers' alleged presence at the scene during which he was arrested, creates a genuine issue of material fact as to which officer or officers applied the force against him.  [Dkt. 57, P's Opp. to MSJ p.5].  Upon review of the Plaintiff's deposition testimony and of the record as a whole, the Court concludes that there is no genuine dispute as to the identity of the officer who allegedly employed force against Mr. Rogoz, and therefore Plaintiff's excessive force claim may proceed against this officer only.

In his complaint, the Plaintiff has alleged that "[w]hile the Plaintiff was on the ground, the Defendant Officers subjected his upper back to severe physical assault . . ." [Dkt. 1, Compl. ¶20].  The Plaintiff's own deposition testimony, though, contradicts his assertion that more than one officer could have caused his injuries, and rather supports the Defendants' contention that only Detective Watson could have applied the force at issue.  Rogoz testified that, after he had obeyed the command to exit his vehicle and lay on the ground, "that was when . . . it was like *someone* came up on me, and it was boom.  *Someone* like threw all their weight on me." [Dkt. 52-13, P's Depo. p.79 (emphasis added)].  Rogoz further testified that "[i]t felt like *he* jumped, you know . . . *he* just like jumped on me is what it felt like . . .," and further, "[i]t seemed like *he* ran up and jumped with his weight onto my back . . ." [*Id.* at. pp.80, 81 (emphasis added)].  When asked if the officer had used one knee or two knees in applying this force, Rogoz testified: "I'm not sure specifically.  It felt like *someone* just jumped on me . . ." [*Id.* at p.80 (emphasis added)].  Rogoz also testified that he believed the same individual who placed a knee (or knees) on his back had "slammed" his head to the pavement as a consequence of the use of force:

> Q:  So, it was *one of these officers* [who] did that to your knowledge?
>
> A:  *I believe so*, and I think there was just one other like close in as they were doing this to me, you know.  I think other ones around or, you know. . . .

[*Id.* at pp.80-81 (emphasis added)].

Rogoz also testified that he believed that the officer who handcuffed him – who he believes to have been wearing plain clothes – is the officer who applied

the allegedly excessive force: "that person who did that [allegedly applied excessive force] to me handcuffed me." [Dkt. 52-13, P's Depo. p.84]. Moreover, Rogoz acknowledged his belief that Detective Watson had handcuffed him, as Watson had reported handcuffing Rogoz in his Incident Report: "when [Watson] said he's the one that handcuffed me, he was the one who handcuffed me after doing that to me." [*Id.* at p.84]. In sum, Plaintiff's claim that one *or two* unidentified officers allegedly used excessive force against him is directly contradicted by his own deposition testimony, in which Rogoz asserted that the plain clothes officer who handcuffed him was the same officer who used the excessive force against him, and in which he acknowledges that Detective Watson reported that he had handcuffed Rogoz.

Plaintiff's affidavit – submitted in support of his opposition to the summary judgment motions – does not save his argument. Plaintiff contends in this affidavit that "[w]hile I was lying on the ground, one or two of the defendant officers jumped onto me with their knees, landing on my back." [Dkt. 57-2, Rogoz. Aff. ¶12]. This assertion, however, that one – *or maybe two* – officers caused Rogoz's injuries does not comport with his deposition testimony as stated above. In the Second Circuit "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) (citing *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). *See also Morales v. Town of Glastonbury*, 3:09-CV-713 JCH, 2012 WL 124582 (D. Conn. Jan. 17, 2012) (same);

*Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").  The Court will therefore disregard paragraph 12 of the Plaintiff's affidavit.

The record available to the Court establishes only that Detective Watson was personally involved in any alleged use of force against Mr. Rogoz.  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see also Wells v. Yale Univ.*, 3:10-CV-2000 CFD, 2011 WL 3328724, at *1 (D. Conn. July 28, 2011) (same).  Because the Plaintiff can point to no true dispute as to which officer handcuffed him, and because Rogoz himself testified that the officer who handcuffed him also applied the allegedly excessive force to his back and ribs, there accordingly exists no basis for Rogoz's excessive force claim to proceed as against any Defendant other than Detective Watson, who admittedly handcuffed Mr. Rogoz.  In addition, no evidence in the record establishes that Officer Water was present at the scene of Rogoz's arrest on May 8, 2009 such that he could be liable for *any* constitutional violation, and Plaintiff has admitted in his opposition that Water was not present at the scene.  [Dkt. 57, P's Opp. to MSJ p.5].  The Court thus GRANTS summary judgment in favor of Defendant Officers Rivera, Water, Rutkauski, Flores, Pileski, and Beiros on Plaintiff's excessive use of force claim.

ii.  <u>Excessive Force as against Detective Watson</u>

Claims that law enforcement officers have used excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. However, the Fourth Amendment requires that an officer's use of force in the course of an arrest or investigatory detention be reasonable. *Id*. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. Accordingly, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (internal quotation marks and citations omitted); *see also Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) ("The force used by the officer [in effecting an arrest] must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer.").

The reasonableness of a particular use of force must be judged objectively under the totality of the circumstances and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490

U.S. at 396; *see also Jones*, 465 F.3d at 61 ("We are, of course, mindful that the reasonableness inquiry does not allow us to substitute our own viewpoint; we must judge the officer's actions from the perspective of a reasonable officer on the scene").  Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* at 396 (internal quotation marks and citations omitted).  Nor may an officer's subjective intentions automatically render a use of force unreasonable: "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397.

Moreover, it is well established that "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted); *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (holding same).  "Qualified immunity thus affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions [ ] and 'protects all but the plainly incompetent

or those who knowingly violate the law' from liability for damages." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (internal citations omitted).  "Accordingly, when a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  *Tracy*, 623 F.3d at 96.  Put another way, "[a] police officer performing a discretionary function enjoys qualified immunity from an excessive force claim unless (1) she 'violated a constitutional right' (2) that was 'clearly established' at the time of the alleged violation."  *Hodge v. City of Long Beach*, 425 F. App'x 33, 34 (2d Cir. 2011) (internal quotation marks and citations omitted).  It is within the sound discretion of a federal court to analyze the two qualified immunity factors in the order of its choosing, in light of the circumstances of the case at hand.  *Pearson*, 555 U.S. at 236.

        As to the "clearly established" prong of this analysis, "[t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overturned on other grounds) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Whether a right has been clearly established is judged from the standpoint of a reasonable law-enforcement officer."  *Vasquez v. Klie*, 12-2185, 2013 WL 850236,

at *1 (2d Cir. Mar. 8, 2013) *cert. denied*, 12-9788, 2013 WL 1687509 (June 3, 2013). The right to be free from the use of excessive force under the Fourth Amendment is clearly established. *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000); *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D. Conn. 2007). Thus, the issue is whether it was objectively reasonable for the officer or officers to believe that their particular actions did not violate the Plaintiff's right to be free from the excessive use of force. Further, "the objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (internal quotation marks and citation omitted); *Vasquez*, 2013 WL 850236, at *1 ("[e]ven if the law is "clearly established" at the time, qualified immunity is also appropriate "if it was objectively reasonable" for the officer "at the time of the challenged action to believe his acts were lawful."); *Crowell v. Kirkpatrick*, 400 F. App'x 592, 594 (2d Cir. 2010) ("even if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context."). Accordingly, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Lennon*, 66 F.3d at 425. In other words, "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law. Police officers

are entitled to rely on existing lower court cases without facing personal liability for their actions." *Pearson*, 555 U.S. at 244-45.

Rogoz asserts that any force used against him was improper because he did not flee from the police, but instead attempted to elude an unidentified individual who exhibited suspicious behavior toward him, and who was only later identified as a plain clothes police officer.  He also contends that the force was unreasonable because at the time the force was employed he had willingly obeyed police commands to pull over, exit his vehicle, lie face-down on the ground, and put his hands in the air.  Defendants urge the Court to grant summary judgment in favor of Detective Watson because the force allegedly used was objectively reasonable in light of the circumstances confronting Watson and, because even if it was not, Watson is entitled to qualified immunity.  The Court agrees with the Defendants and concludes that the force employed did not violate Rogoz's constitutional rights and that, even if it did, Detective Watson is entitled to qualified immunity, as a reasonable officer would have believed that the use of force alleged was objectively reasonable in light of the circumstances.

On the morning of May 8, 2009 Detective Watson was performing surveillance in an urban area that, according to Watson's Incident Report, was a "hot spot area for illegal drug activity," had prompted numerous citizen complaints to the Hartford Police Department, and in which Watson had made numerous arrests for drug activity.  During his surveillance, Watson observed a blue Chevy Blazer – later confirmed as that driven by Rogoz – park at the street curb.  Watson observed a man approach the vehicle, engage in a conversation

with the driver, reach into the vehicle, and hand the driver a small package in exchange for money, actions Watson described as "consistent with a street level drug deal."  Watson then observed and followed the Blazer as it pulled away from the curb, drove south, turned onto a one-way street, and once again parked at the curb.  Watson exited his vehicle, claims to have displayed his badge and verbally identified himself as a police officer, and attempted to approach the passenger side of the Blazer, at which point the Blazer reversed quickly the wrong way down the one-way street on which oncoming vehicles were traveling, braked, put the car in gear, and "drove forward directly" at Watson, who had been approaching the vehicle from the street.  Watson then observed the Blazer drive onto the sidewalk, going around Watson and parked vehicles, "at a high rate of speed." Once back on the street, Watson reported that the Blazer ran the red light at the end of Babcock Street and turned west onto Capitol Avenue at a high rate of speed.  Watson followed the Blazer from a distance as the Blazer drove onto Interstate 84, and he broadcasted his and the Blazer's direction over the police radio.

Rogoz does not seriously dispute Watson's recall of the events leading up to his arrest and in most cases has corroborated Watson's account.  Rogoz admits that he drove to Lawrence Street in Hartford on May 8, 2009, engaged in a drug transaction with an unidentified man for several baggies of heroin, drove off after purchasing the drugs, and then pulled his car to the curb on a one-way street.  He admitted that when he became suspicious that a red Honda was following him he pulled his Blazer away from the curb and pulled over a third time

further down the one-way street.  When the red Honda again followed him and pulled in front of his vehicle and an unidentified individual began to exit the vehicle, Rogoz became alarmed and admittedly backed his car up "a little bit" on the one way street.  As he was looking to the rear while backing up, Rogoz admits that he saw an oncoming car driving toward him, so he put the Blazer in gear and began to drive forward as the man from the red Honda was running toward him. Although Rogoz now argues that this individual did not identify himself as a police officer (and thus Rogoz could not have fled from law enforcement), Rogoz testified during deposition that he could not provide any details relating to this individual as he was approaching Rogoz's car because "it was just so fast, and right then I'm just trying to get, you know . . . around him, but then it was obvious. I could tell even with the door opening; and the way I saw him the first time, it seemed like something, you know, something wasn't right."  He could not provide a description of the man and was unable to say if the man had been alone in the red Honda.  Rogoz's inability to provide any details given his assertion of the rapidity of the events on the morning of May 8 speaks to exactly that – the brevity of Rogoz's direct encounter with Watson and the urgency with which he approached the situation – but does not detract from Watson's direct observation of the events that unfolded.

Rogoz admits that he then "took off," drove up over the curb on his left because the man from the red Honda was in the roadway, drove on the sidewalk around the man's car at approximately twenty miles per hour, and re-entered the roadway.  Although Rogoz does not remember going through a red light at the

end of the street without stopping, he testified that he had "possibly" done so. He admits that he then turned onto various city streets, accelerating and driving through the city at approximately fifty miles per hour before entering onto Interstate 84.  Although Rogoz contends that there exists an issue of material fact as to whether he was driving "unreasonably fast when he reasonably believed he was being assaulted by strangers," [Dkt. 57-1, P's 56(a)2 Stmnt., Disputed Fact ¶2], Rogoz testified: "I was going fast up until I hit the highway.  Then I was driving like appropriate for the highway because I didn't see anyone, and I didn't think anyone was behind me or anything, so once I hit the highway, I was at appropriate highway speed."  [Dkt. 52-13, P's Depo. p.73].  He further attested: "I knew when I was scared I drove unreasonably fast to get to the highway; I did." [Dkt. 52-13, P's Depo. p.76].

Thus, considering the totality of the above circumstances known to Detective Watson on the morning of May 8, 2009, by the time Rogoz had pulled his vehicle to the shoulder of the highway, had exited his vehicle and had complied with officer commands to lie face-down on the ground with his hands in the air, it was eminently reasonable for Detective Watson to believe the following: (1) that Rogoz had engaged in an illegal drug transaction in an area of Hartford known to Watson for illegal drug activity, and that Rogoz was potentially a felon in possession of illegal narcotics; (2) that Rogoz had pulled his vehicle to the curb in order to ingest the drugs he had purchased, or that Rogoz – who Watson reasonably believed to have just purchased illegal drugs – was already under the influence of illegal substances or was addicted to such; (3) that Rogoz posed a

potential danger to himself, to other drivers, and to pedestrians as he recklessly reversed on a one-way street, drove at a high rate of speed onto and along the street's sidewalk in order to drive around Watson and his vehicle, ran a red light at a high rate of speed, and traveled at high rates of speed through city streets, all while potentially under the influence of narcotics; (4) that Rogoz had little regard for his own safety or for the safety of others for the same reasons; (5) that Rogoz posed and could continue to pose a risk to law enforcement based on Rogoz driving his Blazer directly toward Watson on the one-way street before veering onto the sidewalk to avoid Watson; and (6) that Rogoz had fled after Watson had identified himself as a police officer verbally and by displaying his badge, and had ceased his flight only after driving at a high rate of speed through city streets, and after several police cruisers caught up to him on the highway.

Although Rogoz had complied with the officers' orders to pull over, exit his vehicle, and lie face down on the ground, he did so only after having failed to obey Watson's orders to stop on Babcock Street and after having fled from Watson through the city of Hartford at admittedly high rates of speed.  The force used by an officer against a suspect who is attempting to resist arrest, threatening, or assaulting an officer "must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."  *Sullivan*, 225 F.3d at 166.  Based on the totality of the circumstances known to Detective Watson at the time, it was reasonable for Watson to conclude that quickly transferring his weight to Mr. Rogoz's back and ribs – after having followed Mr. Rogoz's urgent flight from law enforcement

through Hartford's streets – in order to assure that Rogoz did not resume this flight, to ensure the safety of Mr. Rogoz, the officers on the scene, and other drivers on the side of a busy highway, and to effectuate Rogoz's arrest would not violate Mr. Rogoz's right to be free from the use of excessive force. "[S]ome degree of physical force is incident, and even necessary, to making an arrest, especially in situations where the suspect has previously refused to comply with the officers' orders." *Davis v. Callaway*, 3:05CV00127DJS, 2007 WL 1079988, at *5 (D. Conn. Apr. 9, 2007). Here, Rogoz had actively resisted Watson's attempt to apprehend him after he had purchased heroin. It was reasonable for Watson to employ some force against Rogoz after Rogoz's traffic stop given that Watson had witnessed first-hand Rogoz's earlier volatility in response to his attempt to stop Rogoz.

It was also reasonable for Detective Watson to conclude that Rogoz could continue to pose a flight risk once he had been stopped on the highway. Rogoz was potentially under the influence, had moments before actively attempted to elude police, and had shown a blatant disregard for public safety by recklessly driving through city streets. Further, the totality of the circumstances speak to a level of urgency that precludes a finding in Rogoz's favor. Rogoz actively and recklessly resisted Watson's efforts to stop him after he had been observed purchasing illegal drugs (a charge to which he later pled guilty) and finally submitted to police orders to stop on the side of an interstate highway. The potential danger inherent in a situation involving a fleeing suspect potentially under the influence of narcotics stopped on the shoulder of a busy interstate

would have militated against a lazy approach to apprehending and subduing Mr. Rogoz.  It was thus reasonable for Detective Watson to conclude that subduing Mr. Rogoz quickly and efficiently by putting his knee or knees on Mr. Rogoz's back immediately before being handcuffed would pose the least amount of danger to the officers on the scene, to other drivers, and to Mr. Rogoz himself given the tenuous and high-risk location of Rogoz's traffic stop, and to conclude that the manner of subduing Mr. Rogoz did not violate Mr. Rogoz's constitutional rights.  It was further reasonable for Watson to believe that his actions were necessary to properly restrain Rogoz and to assure that he would not jump back up and attempt to flee a second time.  At the very least, officers of reasonable competence could disagree on the legality of Detective Watson's actions under these circumstances.  *See, e.g., Davis*, 2007 WL 1079988, at *4-5 (officer's use of force was reasonable where plaintiff obeyed order to sit on the ground, jumped up to protest treatment of other arrestee, officer tackled plaintiff to ground for the protection of other officers on the scene of a traffic accident and altercation, and officer forcefully placed his knee on arrestee's back to restrain him); *Massaro v. Town of Trumbull*, 525 F. Supp. 2d 302, 308 (D. Conn. 2007) *aff'd sub nom. Massaro v. Jones*, 323 F. App'x 68 (2d Cir. 2009) (granting qualified immunity to officer where, although the officer "may not have needed to push [the suspect] to the ground in order to arrest him, [the officer] was faced with a tense and uncertain situation involving a convicted felon and had to make a split-second decision"); *Mongeau v. Jacksonville Sheriff's Office*, 197 Fed. Appx. 847, 851 (11th Cir.2006) (officer's placement of his knee on an arrestee's back to subdue

him was objectively reasonable given the arrestee's previous resistance, reckless driving to evade police, and risk of flight, where arrestee refused to exit vehicle but had offered no further resistance).

In addition, the crimes with which Mr. Rogoz was charged are serious: possession of narcotics (a class D felony), reckless driving, and failing to stop at the direction of an officer in an attempt to escape or elude law enforcement. Rogoz pled guilty to felony narcotics possession and, although the court entered a nolle as to the other two charges against him, Rogoz admitted under oath that he drove onto and along the sidewalk on Babcock Street at mid-morning at a speed of approximately twenty miles per hour, "traveled very fast," "took off out of there so fast," may have run a red light, and "drove unreasonably fast to get to the highway," admittedly traveling through city streets at around fifty miles per hour at mid-morning on a weekday.  Although Rogoz had not used any drugs or alcohol or taken any medications the morning of May 8, he also admitted that he used heroin on the afternoon of May 7, the day before this incident.  As well as pleading guilty to one serious charge, the actions Rogoz admitted taking posed an immediate and serious risk of harm to the public at large.

Furthermore, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson*, 555 U.S. at 231 (internal quotation marks and citations omitted); *Spavone v. New York State Dep't of Corr. Servs.*, 11-617, 2013 WL 3064853, at *7, --- F.3d --- (2d Cir. June 20, 2013) (same).  Plaintiff argues that it was unreasonable for Watson to use any force

against him because he was unaware at the time Watson attempted to approach Rogoz's vehicle on Babcock Street that Watson was a police officer, and therefore he did not flee from law enforcement officials but rather from an unidentified man who he reasonably suspected was threatening him.  Watson, however, reported that as he approached Rogoz's vehicle he displayed his badge and verbally identified himself as a police officer.  While Rogoz disputes that Watson provided identification, his dispute is tempered by the urgency with which Rogoz undertook to flee a perceived dangerous situation and his inability to recall any details as to the individual who approached his car.  Given the circumstances, while it was perhaps reasonable for Rogoz to have believed that Watson was *not* a police officer, it was also reasonable for Watson to believe that Rogoz had attempted to flee from law enforcement by way of reckless driving and to respond accordingly.  Thus, even if Watson's use of force was constitutionally excessive, it was based heavily on a reasonable mistake of fact and thus merits qualified immunity.  *See, e.g.*, *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003) (qualified immunity analysis acknowledges that "reasonable mistakes can be made as to the legal constraints on particular police conduct" and "ensures that all but the plainly incompetent or those who knowingly violate the law are protected from suit").

Moreover, for purposes of the qualified immunity analysis, while the right to be free from the use of excessive force under the Fourth Amendment is clearly established, *Green*, 219 F.3d at 59, the right of a potential felon who has just engaged in a drug transaction and has fled from law enforcement to be free from

an officer's forceful placement of his weight on such suspect's back to effectuate the suspect's arrest and to keep him from fleeing is much less clearly defined.  In *Davis v. Calloway*, this court found an officer's use of force to be reasonable where the officer tackled the plaintiff to the ground after the plaintiff had jumped up from a seated position to protest the arrest of another individual, forcefully placed his knee on the plaintiff's back, pepper sprayed the plaintiff, and forcefully placed the plaintiff in handcuffs, allegedly exacerbating an existing rotator cuff injury, among other things.  3:05CV00127DJS, 2007 WL 1079988 (D. Conn. Apr. 9, 2007) (DJS).  The plaintiff in *Davis*, though, had not previously attempted to evade police, had not engaged in reckless driving, and ultimately pled guilty to breach of the peace, a much less serious offense than those alleged here.  *Id.*

On the other hand, courts often find to be excessive similar force used against an arrestee *after* the arrestee has been handcuffed, or where the arrestee offered no resistance.  *See, e.g., Bridgeforth v. Cnty. of Rensselaer*, 1:08-CV-0779 LEK/RFT, 2012 WL 2873361 (N.D.N.Y. July 12, 2012) (summary judgment improper where plaintiff alleged that he was kicked and battered after being subdued) (collecting cases); *Johnson v. City of New York*, 05 CIV. 2357 (SHS), 2006 WL 2354815, at *4 (S.D.N.Y. Aug. 14, 2006) (summary judgment improper where, during narcotics raid, unresisting plaintiff was thrown off bed, stepped on, stomped on, and kicked; while "an officer's holding an individual to the ground with his foot during a potentially dangerous narcotics search is likely objectively reasonable," "it could not be objectively reasonable for Officer Holland to have believed that the use of gratuitous force beyond what is necessary to subdue an

individual during a search is allowed under the law").  This case is distinguishable from *Bridgeforth* and *Johnson* because those cases involved the gratuitous and unnecessary application of force.  Watson applied force only once.  After securing Rogoz by applying force to his back, Watson placed handcuffs on Rogoz and took him into custody without applying any further force.  Here there is no evidence of gratuitous infliction of force.

Given the nature of the above law, it is unclear that a use of force to subdue an individual in circumstances akin to those in this case, *after* the individual has fled from police but *prior* to the individual being placed in handcuffs on the side of a highway, would violate such an individual's Fourth Amendment rights.  "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.  The unlawfulness must be apparent."  *Rosado v. Williams*, CIV.A.3:04CV369(JCH), 2006 WL 1168032, at *4 (D. Conn. Apr. 26, 2006) (citing *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999)).  The unlawfulness of Watson's alleged conduct in this case is not readily apparent to a reasonable person, and thus the Court cannot say that Watson had fair warning that his actions would violate Rogoz's constitutional rights.  In sum, this right was not so clearly established that Watson would have reasonably believed he was violating Rogoz's constitutional rights when he put his weight on Rogoz's back to effectuate his arrest; at the very least, officers of reasonable competence could disagree as to the legality of Watson's actions.  Thus, as reasonable officers could disagree as to what the law

required in this situation, Watson is likewise entitled to qualified immunity.  *See*

*Doninger v. Niehoff*, 642 F.3d 334, 354 (2d Cir. 2011) cert. denied, 132 S. Ct. 499

(2011) ("the Supreme Court has repeatedly affirmed, '[i]f the [official's] mistake as

to what the law requires is reasonable ... [she] is entitled to the immunity

defense.'") (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2011)).

 For the foregoing reasons, the Court GRANTS summary judgment in favor

of Detective Watson as to Plaintiff's excessive force claim, as the force used did

not violate the Fourth Amendment and, even if it did, Detective Watson is entitled

to qualified immunity.

  **b.**  <u>Unreasonable Use of Force in violation of Article First, section 7 of
the Connecticut Constitution (Count 1)</u>

 Rogoz also alleges that the officers violated rights protected by Article

First, section seven of the Connecticut Constitution.  Section seven protects

against unreasonable searches and seizures, and several courts have ruled that,

like the Fourth Amendment, it also protects against the unreasonable use of force

in effecting arrests.  *Carey v. Maloney*, 480 F. Supp. 2d 548, 561 (D. Conn. 2007)

(CFD); *Morales v. Town of Glastonbury*, 3:09-CV-713 JCH, 2012 WL 124582, at *8

(D. Conn. Jan. 17, 2012).  Connecticut courts analyze excessive force claims

brought under section seven and 42 U.S.C. § 1983 analogously.  *Morales*, 2012

WL 124582, at *8; *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 379 n.3 (D.

Conn. 2009); *Carey*, 480 F. Supp. 2d at 561.  Because the Court has found that

Rogoz may not sustain his excessive force claim as to any of the Defendant

Officers, summary judgment is likewise GRANTED in favor of the Defendant

Officers as to Rogoz's claim pursuant to Article First, section 7 of the Connecticut Constitution.

### c. Failure to Intercede in violation of the Fourth Amendment (Count 1)

Rogoz contends that the defendant Officers violated his Fourth Amendment rights when they failed to protect him from or intercede in the use of force against him. Defendants counter that the mere presence of the Defendant Officers at the scene of Rogoz's arrest, without more, does not establish that the Officers had a reasonable opportunity to intercede. Because the Court has concluded that Detective Watson's use of force did not violate Mr. Rogoz's Fourth Amendment rights, the Defendant Officers are entitled to summary judgment on Rogoz's claim that they failed to intercede in Watson's use of force. However, even if Watson *did* violate Plaintiff's Fourth Amendment rights by employing excessive force, the remaining Defendant Officers would still be entitled to summary judgment on Rogoz's failure to protect or intercede claim.

"A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). An officer will be liable for failure to intercede where the officer "observes excessive force is being used or has reason to know that it will be." *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Whether an officer had sufficient time

to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id*. *See also Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 21-22 (2d Cir. 2012) (citing *supra*, *O'Neill*, *Curley*, and *Anderson*).

Even construing the facts in the record in the light most favorable to Mr. Rogoz, the Plaintiff has failed to present any evidence such that a jury could reasonably conclude that the officers on the scene of Rogoz's arrest had a "realistic opportunity" to prevent the injuries he allegedly sustained.  Mr. Rogoz testified that, after he had exited his vehicle and had lain on the ground with his hands in the air, "that was when . . . it was like someone came up on me, and it was boom.  Someone like threw all their weight on me."  [Dkt. 52-13, P's Depo. p.79].  He further explained that it seemed as if the officer had "jumped" onto his back, one time.  [Dkt. 52-13, P's Depo. p.80].  Rogoz has not provided any evidence that the officer who applied the force continued to do so for any extended length of time such that other officers on the scene would have had an opportunity to intercede.  Rather, Rogoz has described the incident using terms that indicate that the force applied to his back and ribs was fleeting: "boom" and "jump" denote ephemeral occurrences, and ones during which any injury would likely occur on impact.[2]  Moreover, there is no evidence in the record that

---

[2] Rogoz argues this point exactly in his opposition to the Defendants' motions. He alleges specifically that the "impact [at the time the officer placed his weight on Rogoz's back] caused his face to slam into the ground" and caused the additional injuries of which he complains.  He does not allege that an extended

suggests that Watson remained atop Rogoz's body for more than a brief moment; instead, Rogoz testified that he felt the officer's weight on his back and then the officer handcuffed him.  [Dkt. 52-13, P's Depo. p.84].

Although Rogoz testified that he believed "there was just one other [officer] like close in" while he was on the ground and that he thought "other ones" were "right around," Rogoz has proffered no evidence by which a jury could conclude that any of these officers were close enough to prevent an admittedly brief use of one-time force that caused injury allegedly on impact and not thereafter. Furthermore, as noted prior, no evidence in the record establishes that Officer Water was even present at the scene of Rogoz's arrest on May 8, 2009 such that he could be liable for failing to intervene, and Plaintiff has admitted Water's absence in his opposition to summary judgment.  [Dkt. 57, P's Opp. to MSJ p.5]. Rogoz's failure to offer any evidence that the Defendant Officers had a realistic opportunity to intervene equates to a failure to provide proof as to an essential element of Rogoz's claim.  At the summary judgment stage, Rogoz is "required to present admissible evidence in support of" his allegations; "allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004).  Absent any such proof, no genuine issue as to any material fact remains to support Rogoz's failure to intercede claim.

---

period of contact caused his injuries, but rather that the collision of the officer's body with Rogoz's caused his injuries.  [Dkt. 57, P's Opp. to MSJ p.5].

The Court GRANTS summary judgment in favor of the Defendant Officers on Rogoz's failure to intercede claim.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (entry of summary judgment is mandated after adequate time for discovery and upon motion "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial.").  *See also O'Neill*, 839 F.2d at 11-12 (officer had no realistic opportunity to intercede where plaintiff was struck three times in rapid succession: "[t]his was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator."); *Lupinacci v. Pizighelli*, 588 F. Supp. 2d 242, 251 (D. Conn. 2008) (JCH) (nearby officers not liable for failure to intercede where officer tackled and arrested plaintiff suddenly and where there was "no evidence that any constitutional violations were of sufficient duration that these officers could have interceded in a timely manner").

### d. Supervisory Liability against Chief Daryl K. Roberts pursuant to 42 U.S.C. § 1983 (Count 3)

Rogoz alleges supervisory liability against Chief Roberts in his individual capacity.  In the third count of his complaint, Plaintiff alleges that the City of Hartford acted "by and through Chief Daryl K. Roberts, who is the final

policymaker in the area of law enforcement, and had in effect actual and/or de facto policies, practices and customs," including "the failure to properly screen, discipline, transfer, counsel and/or otherwise control police officers," and "the failure to properly train and supervise police officers . . . in the law of using unreasonable, unjustified and excessive force; and the duty to intervene to protect and secure individual civil rights."  [Dkt. 1, Compl. ¶¶25, 26].  Rogoz also posits a second theory of liability in that Chief Roberts failed to investigate Rogoz's civilian complaint to the Department "and other similar claims of misconduct brought by other citizens," thus demonstrating "negligence and a deliberate indifference to the safety and rights of such persons" under the U.S. Constitution.  [Dkt. 1, Compl. ¶28].

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.'"  *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (VLB) (quoting *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir.1987)).  "A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."  *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).  Put another way, "[a]n individual cannot be held liable for damages under § 1983 merely because he held a high position of authority," or was a supervisor.  *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (internal quotation marks and citations omitted).  Instead, supervisory liability

may be established by one or more of the following factors articulated in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995):

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* [3]

Here, because the Court has ruled that Mr. Rogoz was not subjected to any constitutional violation, his claims for supervisory liability necessarily fail. However, even if Rogoz has suffered violations of his constitutional rights, he cannot maintain a supervisory liability claim because he cannot satisfy any of the above *Colon* factors in relation to either of his two theories of liability.

Although Rogoz claims that Roberts failed to investigate his civilian complaint, thus exhibiting deliberate indifference under the fifth *Colon* factor, the record clearly indicates the contrary: that the Hartford Police Department made a good faith attempt to investigate Rogoz's civilian complaint *despite* Rogoz's failure to cooperate in the investigation.  Rogoz filed a civilian complaint with the Hartford Police Department in September, 2009.  The City's Office of Human Relations confirmed receipt of the complaint by letter on September 17, 2009, and

---

[3] The Court notes that the recent Supreme Court decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) has called into question whether all of the *Colon* factors remain a basis for establishing supervisory liability and that "no clear consensus has emerged among the district courts within this circuit."  *Aguilar v. Immigration and Customs Enforcement Div. of the United States*, No.07CIV8224, 2011 WL 3273160, at *10 (S.D.N.Y. August 1, 2011) (collecting cases).

informed Rogoz that the Internal Affairs Division would investigate the complaint. Rogoz recalled receiving such a letter. Rogoz spoke with a representative from the Internal Affairs Division to arrange an appointment to be interviewed, but believes that he canceled the appointment. In November, 2009, Sergeant Manson – the investigator assigned to the complaint – sent Rogoz a letter requesting that he reschedule his interview and indicating that this interview was imperative to Manson's investigation of the incident. Rogoz attested to his receipt of this letter but he failed to reschedule the interview and never met with any City employee to discuss his complaint. Sergeant Manson, on the other hand, reported that he interviewed Detectives Watson, Rivera, Pileski, Rutkauski, and Flores, and Sergeant Michael Cacioli during his investigation and also reviewed a number of documents and audio recordings prepared during or in relation to the incident. He ultimately concluded that Rogoz's allegation of excessive force was not sustained. On March 11, 2011 the City sent and Rogoz believes he received a letter advising him of this determination and of his right to appeal to the City's Civilian Police Review Board. Rogoz does not know if he appealed the determination.

Rogoz has provided no evidence in the record to suggest that the City did *not* perform a thorough investigation of his complaint, or that Chief Roberts condoned a deficient investigation. Rogoz has likewise failed to present any evidence which if proved would tend to show that Chief Roberts created a specific policy or custom by which the City or the Department failed to investigate civilian complaints, that Roberts was grossly negligent in supervising

subordinates who then failed to investigate his complaint, or that Roberts engaged in any conduct from which a jury could conclude that Roberts exhibited deliberate indifference by failing to act upon specific information which did or should have put him on notice that unconstitutional acts were occurring.  To the contrary, the record strongly suggests that Rogoz's civilian complaint was subject to a thorough investigation and that Rogoz did not avail himself of the procedures in place by which he could have assisted the investigation or appealed its ultimate determination.

Likewise, Rogoz's supervisory liability claim based on Roberts' alleged failure to screen, train, or supervise the Defendant Officers in such a way as to protect Rogoz's right to be free from the use of excessive force and to maintain the Officers' duties to intervene and protect individuals from violations of their civil rights is also meritless, as Rogoz has put forth no evidence to satisfy any of the five *Colon v. Coughlin* factors.  First, in relation to his excessive force claim, Rogoz has provided no evidence in the record that Chief Roberts participated directly in the application of force against him on May 8, 2009, or that Roberts himself failed to intervene.  Second, Rogoz has proffered no evidence that Chief Roberts became aware of the alleged use of excessive force against Rogoz but then failed to remedy the wrong.  To the contrary, Rogoz availed himself of the Hartford Police Department's civilian complaint procedure, his complaint was investigated despite his non-participation in the investigation process, and no evidence suggests that Rogoz appealed the City's ultimate determination that Rogoz's allegations were unsustained.

Third, aside from Plaintiff's conclusory allegation that such policies, practices, or customs existed, Plaintiff has offered no additional evidence in the record that Chief Roberts created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.  *See, e.g.*, *Paulin v. Figlia*, 11 CV 9634 VB, 2013 WL 120167, at *8 (S.D.N.Y. Jan. 10, 2013) ("[p]laintiff's statements in his opposition alleging a custom of grossly negligent supervision and failure to stop unconstitutional acts from occurring are . . . inadequate to state a claim" where plaintiff failed to allege specific allegations of fact tending to support such an inference).  Lastly, Rogoz has failed to point to admissible evidence in the record tending to show that Roberts was grossly negligent in supervising subordinates who allegedly used excessive force against or failed to intervene on Rogoz's behalf, or that Roberts engaged in specific conduct from which a jury could conclude that he exhibited deliberate indifference by failing to act upon specific information which did or should have put him on notice that unconstitutional acts were occurring.  As noted prior, Rogoz availed himself of part of the City's complaint procedure but neglected to participate fully in the investigation of his complaint.  At the summary judgment stage Mr. Rogoz must present admissible evidence in support of his allegations; "allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  He has not done so.  Because Rogoz has failed to offer evidence

other than "conclusory assertions without further support in the record,"
summary judgment is appropriate on this claim. *Fincher v. Depository Trust and
Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

Furthermore, the Plaintiff has failed to address in any meaningful way the
Defendants' contention that he cannot satisfy the five *Colon* factors such that
supervisory liability would attach to Chief Roberts. This failure alone is enough
to support a grant of summary judgment in favor of Defendants on this count. As
the Plaintiff has failed to address the theory upon which the Defendants seek
dismissal of his supervisory liability claim, this claim may be deemed abandoned
and may be dismissed. *See Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F. Supp.
2d 197, 206 (D. Conn. 2008) ("Federal courts may deem a claim abandoned when
a party moves for summary judgment on one ground and the party opposing
summary judgment fails to address the argument in any way.") (internal quotation
marks and citation omitted); *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296,
305 (D. Conn. 2009) (same).

Rogoz instead argues in his opposition *solely* that the Court should deny
Defendants' motions for summary judgment as to supervisory liability "because
the plaintiff has outstanding discovery requests to compel the production of the
personnel and disciplinary files for each of the officers and detectives involved in
the plaintiff's arrest," which Plaintiff opines could establish supervisory liability
under *Colon v. Coughlin*. [Dkt. 57, P's Opp. to MSJ p.3]. In support, Plaintiff
asserts that he

> **has filed a Motion to Compel discovery (Doc. No. \_\_\_, filed _____) to compel the production of the personnel and disciplinary files for each of the officers and detectives involved in the plaintiff's arrest, to establish the history of disciplinary actions and violations.**

**[Dkt. 57, P's Opp. to MSJ p.3 n.1 (as appears in document; omissions Plaintiff's)].**

Plaintiff's argument, however, is as inappropriate as it is inaccurate.  The Plaintiff has given no explanation in his opposition to summary judgment as to why discovery was not adequately conducted during the allotted time period, nor has the Plaintiff submitted an affidavit or declaration explaining such reasons as required by Federal Rule of Civil Procedure 56(d).[4]  "In a summary judgment context, an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion."  *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138, (2d Cir. 1994) (internal quotation and citation omitted).  "Requests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored."  *Id*, at 1139.

In this case, the deadline for conducting discovery was October 1, 2012, which the Court then extended to November 1, 2012, giving the parties more than a year and a half for discovery from Plaintiff's commencement of this action on March 31, 2011.  Although the Court granted this deadline extension at the request of the Defendants and with Plaintiff's consent, the motion for extension

---

[4] **While the Plaintiff has not requested that the Court reopen discovery, the Court construes the Plaintiff's argument in its opposition to summary judgment as such a request.**

of time did not mention any discovery due from the Defendants to the Plaintiff, nor did the Plaintiff file his own motion requesting an extension of any deadlines to obtain the discovery he now claims he lacks.  Moreover, Plaintiff's claim that he has filed a motion to compel is false; the docket reveals that no party to this action has filed a motion to compel, nor have the parties brought any discovery disputes to the Court's attention.  Lastly, the Court expressly addressed the deficiencies in Plaintiff's supervisory liability claim against Chief Roberts in its September 24, 2012 Order Granting in Part and Denying in Part the Defendants' Motion to Dismiss.  Thus, the Plaintiff had the reason and opportunity to have discovered facts relevant to this claim for more than a year and a half before the close of discovery, and never once brought to the Court's attention any issues or disputes in doing so.  Consequently, the time has long passed for the Plaintiff to seek such discovery.  *See Latimore v. NBC Universal Television Studio*, No. 11–1202–cv, 2012 WL 1863787, at *1 (2d Cir. May 23, 2012) (affirming district court's denial of additional discovery where plaintiff had "more than enough time to conduct discovery, and she did not demonstrate that further discovery would likely uncover any evidence of [copyright violations]."); *Cornell v. Kapra*, No. 11–530–cv, 2012 WL 1506049, at *1 (2d Cir. May 1, 2012) (affirming district court's denial of additional discovery where six months elapsed without either party noticing a deposition, and where plaintiff failed to file an affidavit sufficiently explaining the need for additional discovery as required by Rule 56(d)).

The Court thus GRANTS summary judgment in favor of Defendant Daryl Roberts on Rogoz's claim for supervisory liability pursuant to 42 U.S.C. § 1983, and DENIES Rogoz's request to reopen discovery.

### e.  Additional State Law Claims (Count 2)

In addition to Plaintiff's federal law claims, Rogoz has asserted Connecticut state law claims for negligent violation of rights, reckless violation of rights, assault/battery, and negligent and/or intentional infliction of emotional distress. Having granted summary judgment as to the federal law claims (and certain state constitutional claims) against the Defendants, the Court declines to exercise its supplemental jurisdiction over the Plaintiff's additional state law claims. "Supplemental or pendent jurisdiction is a matter of discretion, not of right. Thus, the court need not exercise supplemental jurisdiction in every case." *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 715-26 (1966)).  "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent.  In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction."  *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to

be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims").

Because this Court has granted summary judgment for the Defendants on Plaintiff's 42 U.S.C. § 1983 claims, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Rogoz's remaining state law claims. *See Zito v. Fried, Frank, Harris, Shriver & Jacobson LLP*, 09 CIV. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d. Cir.1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims. If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'")).

### f.   Conn. Gen. Stat. §§ 52-557n, 7-465 (Count 4)

Plaintiff alleges in Count Four of his complaint that the City is liable for the negligent acts of the Defendant Officers pursuant to Conn. Gen. Stats. § 52-557n and § 7-465, in connection with the Officers' alleged *negligent* use of excessive force and *negligent* failure to protect or intervene. Defendant City of Hartford contends that Plaintiff may not maintain an action in negligence based on the same facts alleged to support his claims of *intentional* use of excessive force and *intentional* failure to protect or intervene and, even if Plaintiff may, the City is entitled to governmental immunity.

The Court finds it is unnecessary to address the parties' arguments on this count.  Because this Court has granted summary judgment for the Defendants on Plaintiff's federal claims, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Rogoz's negligence claims under the Connecticut General Statutes for the same reasons as articulated *supra*.

## VI.   <u>Conclusion</u>

For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED in favor of Defendants as to the entirety of Plaintiff's federal and state constitutional claims in Count 1 (including claims of excessive force, false arrest, failure to provide medical care, and failure to intercede); GRANTED as to Plaintiff's state claims for false imprisonment and/or failure to provide medical treatment in Count 2; GRANTED as to Plaintiff's claims of supervisory liability in Count 3; and GRANTED as to Plaintiff's remaining allegations in Count 4 relating to false arrest, false imprisonment, and failure to provide medical treatment.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims in Count 2, and also declines supplemental jurisdiction over Plaintiff's state law claims in Count 4 relating to negligent use of excessive force and negligent failure to protect or intervene.  The Clerk is directed to enter judgment in favor of Defendants and to close the case.

**IT IS SO ORDERED.**


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: July 22, 2013**